Good morning and welcome. Thank you very much for coming to the Ninth Circuit today. We have three matters on calendar and all of them will be argued. So let's please start with the first case, Helena Hunters and Anglers Association v. Moore. Good morning, Your Honors. Matthew Bishop for Helena Hunters, for plaintiffs' appellants in this case. And if I may, I would like to reserve at least five minutes for rebuttal. Go ahead, please. Okay, thank you. Your Honor, the Helena National Forest in Montana is critical for grizzly bear conservation. This is because of its central location in between two recovery zones for the species. One to the north is the Northern Continental Divide ecosystem around Glacier Park, and the area to the south is the Greater Yellowstone ecosystem. And if grizzly bears are going to survive and recover in the west, they need to reestablish connectivity between these two areas. And to do so, they'll need to inhabit and travel through large parts of the Helena National Forest. The Helena National Forest is also really important because it provides amazing wildlife habitat for a variety of species, primarily because, and a result of, having very robust forest plan standards for wildlife. This includes not only standards for individual species like grizzly bears in certain places or Canadian lynx, but also forest-wide standards, which is very unique for big game species, which include elk, deer, moose, et cetera. Can I ask you, are there any topics within the 10 big game wildlife standards that weren't covered in the biological opinion? Certain aspects of the – yeah, our position, Your Honor, is that of the 10 standards, the big game standards, we do sort of refer to them generally as the 10 standards. I would say of the 10, there are some that have to do with mapping. For the most part, they focus primarily on the need for cover and road density standards. Right. And do you feel that cover and road density standards were not covered in the BIOP, or …? That's right, Your Honor. At all? Our position is that they were not addressed in the effects of the action section. That the environmental baseline part of the BIOP, which is really a snapshot of the landscape before the action occurs, did address the situation before the action occurred, which was the Helena Forest Plan with the 10 standards. So you would agree – it's not that there are missing topics. You just feel like the coverage of each topic was insufficient, or at least the coverage of some of the topics was insufficient. Yeah. And the focus of the case is really on the Forest Service's decision to do some of its decision when consulting in the biological opinion. Would you be satisfied if the document said, we have extinguished the 10 standards and considered the conditions under the 10 standards? I think they would need to do more than that, Your Honor. And let me sort of explain why. Because it's not just that – so they omitted them altogether, but the implications, the potential effects, it was a significant weakening of protections for grizzly bears on the forest because it did away with the road density requirements and the cover requirements. And that has effect on future projects that may be authorized in the forest. For example, if you're going to allow – Is it your position that they didn't deal with cover and they didn't deal with road density? No. No, Your Honor. They did deal with it in terms of addressing motorized access road density. What they didn't deal with was allowing those activities in the future without the sideboards or the guardrails provided by the 10 standards. So, for example, every logging project in the Helen National Forest since the forest plan was adopted had to provide at least 35 percent hiding cover, which means a lot more trees on the landscape. And they had to limit road densities for every logging project. There's a lot of temporary roads that are built for logging projects. And they had to close roads in order for those logging projects to occur. Our position here, Your Honor, is that when they allow future logging projects now under this new plan, there's no longer a 35 percent hiding cover requirement. And there's no longer a requirement to have road density standards in place throughout the entire forest. So large areas that are very important for grizzly bears, like the devised landscape, where we really need bears moving, no longer have protective standards on the forest. And that's why we're here, and that's why we brought this case. What are we supposed to make of the – I mean, the biological opinion notes that future actions carried out under the plan will have to be addressed in subsequent consultations. They acknowledge the difference between standards and guidelines, and say that to the extent that the – you know, there's a deviation from the guidelines, that would have to be evaluated by future consultations. Why isn't your concern addressed by that future process? Because, Your Honor, in simple terms, the past isn't really prologue. If you look at how they address temporary roads for logging projects – this is on 2 ER 114 – I think it provides a good example of why the change matters. Because what they said there is, well, we look back over the last eight years and determined that we had about 98 miles of temporary roads on the forest due to logging. We think that's going to be the same going forward. But that's not really the case, because the old logging projects had to comply with the standards, which basically said, you can't have too many roads, you have to leave a lot of trees. And those were the sideboards or guardrails on every project in the That's a really big deal for grizzly bears because it weakened protections for bears throughout the forest. But that aspect of the action was never addressed in the biological opinion. But why wouldn't any future – like Judge Sung points out – why wouldn't any future consultation or jeopardy determination have to make that then-current environmental baseline assessment? And that assessment would include the degradation that you're saying is going to happen in the interim. Does that make sense? So I guess I feel like, Your Honor, the – They will have to look at it – the baseline at that moment, right? For that individual project. Yeah. So then wouldn't they basically consider any cumulative effects or any degradation that happens between now and the slice in time where they have to make that assessment? I think the assessment at a future site-specific level is much more – much more narrow. It's the action area. It's an individual logging project. The action here is the forest plan, which is the entire Helena. And that's more like a land-use zoning plan. Sort of kind of lays out, you know, what's allowed where in the forest, how much logging in which areas. And then it also has those – I call them sideboards or guardrails – the standards that every project has to comply with. The issue here is, if you're doing away with something that was really protective for bears before, and you're having – the decision now is this is a new plan, shouldn't you have to address that weakening or lessening of protections for bears during the consultation process? And we feel like – You're saying nothing in the future may capture this degradation. Potentially. It won't. Well, because this is their own – this is the only time the agency is consulting on the forest plan decision. They might do future site-specific projects, but those are much more site-specific, and they're not going to capture sort of how we manage the forest at the forest level. Like, that's where these standards are so important. Because everything that happens – everything that's happened in the past had to comply with those standards. They're now gone. So logging is going to be different on the Helen National Forest now because you're not going to have limits on road density, and you don't have to leave a lot of trees on the landscape anymore. And we're not saying they can't do that. I mean, they can decide to make these changes. They have the discretion to do that. But what are the impacts for bears and connectivity in this area? And that's what we feel, Your Honor, that they really overlooked. And I think the reason they overlooked it was because they took the position that it was enough for them to look at the baseline, which is sort of a snapshot of bears before, and then look at the action – the new revised plan. So there's no – there's no likelihood that they'll do a further reevaluation of the forest plan itself in the future? No. Not unless they amend or revise it again. But this is the consultation that's occurring now, and it won't happen again. So if there's a site-specific, say, logging project, it will only look at the site-specific impacts of that project. This is really the opportunity to say, what is this going to mean for grizzly bear conservation movement on the Helena if we do away with these standards that are so beneficial? And one point I want to make that didn't come out in the briefs is, in the previous Helena forest plan, in the previous biological opinions, they always consulted on the benefits of these 10 standards to grizzly bears. It was always part of the biological opinion. They touted the benefits. So why wouldn't you have to consult on the cost to bears from doing away with them? Do you have an example in the record of what you're talking about? Yeah, I do, Your Honor. All right. So in the Helena – I'm sorry, I got – there is – they – so the original forest plan was adopted in 1986, and they consulted back then. And then, in the 2006 biological opinion, they talk – they list almost all of the 10 standards and talk about how they indirectly and directly benefited bears, and that's at 4 ER 717. In 2008, the Helena actually did another consultation on the forest plan because bears are expanding outside the recovery zone, which is what we want. We want bears moving in between Yellowstone and Glacier. And they talk about – again, this is at 4 ER 716 and 717. Now they list the wildlife standards out and talk about the benefits. They don't have the numbers next to them, but those are the standards. And then they also talk about it in the 2014 BIOP. And that's – I'm sorry – biological opinion. And that's at 4 ER 601 to 602. So that's really what this case is about, where, if you have a real benefit for bears that was part of the old forest plan, they consulted on it, we feel they should account for that in the biological opinion going forward and that they failed to do so, which is sort of an important relevant factor that was overlooked that has pretty significant implications for grizzly bear movement along the divide. Your position is that they didn't consider the effect of the elimination of the standards as a certain particular help to the bear, such as cover and denning, et cetera? Yeah. And isn't that dealt with in the plan itself? So the plan deals with activities that's authorized on the forest, but it doesn't deal with the authorization of those activities in the absence of those really protective standards, which used to say you had to keep a lot of trees on the landscape, you had to limit row density. Those are gone now, and they never factored that in. And so they sort of assumed, Your Honor, that things were going to stay the same for grizzly bears, and I guess what we're saying is they're not. This is going to be a pretty significant change. Let me ask you, I want to understand, is your position that it's not good enough to analyze the environmental baseline and the effects of any action, any change that you make between 1986 and in the current forest plan? You have to acknowledge each change, analyze its effect in the BIOP. Yeah, and not each and every change. I think that –  So then what's the criteria for which ones need to be acknowledged and addressed explicitly in the BIOP and which ones you can handle in – what other manner would be satisfactory if it's not explicit? That's a great question, Your Honor, and I think it has to do with whether or not that change would have an effect on grizzly bears. And I think based on the Fish and Wildlife Service's – assessment that these are beneficial for bears, and then all the other evidence in the record about how roads are probably the number one threat for bears, that removing those is not just a minor tweak or change. It's actually a pretty significant one for bears. And that's based on their own findings in the previous biological opinions where they're saying, hey, these are beneficial for bears, and now they're removing them. So in your view, Fish and Wildlife Service would have had to go through each of the 200 changes and say, okay, is this going to affect grizzly bears or not? If it is, then I need to explicitly acknowledge it and address it in the BIOP. Is that your – I don't think so. I mean, I guess I would say – I would look at the previous biological opinions for the Helen National Forest and say, wait a minute, what did we rely on? Okay, there were certain standards that we felt were really helpful for bears. And then to say, okay, we're deciding to remove those standards. And how is that going to affect bears? I guess, in fact, that analysis never happened. And – The problem I'm struggling with is your argument is essentially there used to be a mandatory limit, for example, on roads. Now that that mandatory limit is not there, they're going to build roads essentially without limit. That's an assumption or an inferential leap in that there's no substantive limit now on how many roads. But my understanding is, they still – before they have a project that actually builds roads, would need to do another consultation. Is that not correct? That's true, Yoram, but only at that site-specific project level, which is really different. But they also have to consider cumulative effects, don't they? Yeah, but the scope is much smaller. And I think – one example I wanted to share with you is, if – let's say they had the grizzly bear standards in the old plan, and they decided to do away with those. I don't think there was any question that you'd have to consult on those. And the district court said in his order – he said, well, if the standards – the purpose of the standards was to protect grizzly bears, we think we would have a stronger argument. But because they were designed to protect big game, it's not as strong as argument. And I guess I would respectfully disagree with that because it's all about whether or not the standards, whether they're big game or not, really benefit bears. And if that benefit's being lost, we believe it should be accounted for in the biological opinion. And it wasn't in this case. If I may, I would like to reserve some time for rebuttal. That's fine. You have 4 minutes and 45 seconds. Thank you. Thank you. May it please the Court. My name is Ezekiel Peterson here on behalf of the Fish and Wildlife Service and the Forest Service. The Fish and Wildlife Service complied with the Endangered Species Act when it looked at how – at whether the 2021 forest plan as a whole would jeopardize the continued existence of grizzly bears. In arguing otherwise, plaintiffs misunderstand the fundamental requirements of the ESA. And I want to center us by starting on the statutory requirements of Section 7 of the ESA. What that statute requires is for the Fish and Wildlife Service to look at the action being implemented – here, that's the 2021 forest plan – and determine whether or not it would jeopardize grizzly bears. That's what the Fish and Wildlife Service did. They looked at the entire forest plan. The question is not whether or not this plan is better for grizzlies than the 86 plan, although it almost certainly is. The question is not whether this is the best possible plan for grizzlies. It's simply, under this action, the 2021 plan, would it jeopardize grizzlies' continued existence? The Fish and Wildlife Service worked through all the steps of that analysis appropriately here by looking at the baseline condition of grizzly bears, the effects of implementing the 2021 forest plan as a whole, and then adding those two pieces of the puzzle together to determine whether or not grizzlies would be jeopardized. And ample record evidence supports their – Can you address Mr. Bishop's argument that, you know, the environmental baseline will be degraded over time and we'll never have another opportunity to do a forest-wide analysis? There'll be small, incremental analyses done in the future, but we'll never capture the full impact. Certainly, Your Honor. I think there's multiple points at which the full impact could be captured. Certainly, as Judge Sung referenced, cumulative effects are something that the agency looks at when it analyzes site-specific actions. Right, but that's the whole point. You're saying site-specific. When is there going to be a forest-wide – I think that's Mr. Bishop's point. You know, yes, he conceded you're going to have site-specific analysis, but when is there going to be another forest-wide comprehensive assessment? The only time there will be a – I believe a full forest-wide is if there was another revision to the forest plan. Right, which is unlikely. Is that correct? I believe that they happen at certain intervals, but it wouldn't be for a while. I think that's true. That said, there are monitoring requirements in the forest plan, in the biological opinion, and also there's a regulatory reinitiation requirement for consultation under certain circumstances. So there still could be circumstances by which the Fish and Wildlife Service reinitiates its consultation. But fundamentally here, the Fish and Wildlife Service looked at all the effects of implementing this action as a whole, understood that the action did not include the 1986 big-game standards, and still came to the conclusion that it would not jeopardize the continued existence of grizzlies on the forest. I want to point to a specific example that I think shows that the Forest Service – or, the Fish and Wildlife Service knew what it was doing when it did this analysis. Plaintiffs argue that there's no support for the Fish and Wildlife Service's conclusion that the 2021 forest plan sands the big-game standards, would not jeopardize grizzlies. But the opinion at 2ER.112 explains that outside the recovery zone and Management Zone 1 – so those are the zones where the 2018 grizzly bear amendments apply – outside of those zones, road construction is not limited. Certainly, if the standards were in place, there would still be some sort of substantive limits on road construction, because the standards at 4ER.810 and 11 apply across the forest. And those would be in place if the standards still existed in the plan. But the Fish and Wildlife Service explains that it still expects that there will be a decrease in miles of permanent roads over the life of the plan, because roads that are no longer needed will continue to be removed from the landscape. They make that determination at 2ER.112. And then at 2ER.136, the Forest Service goes on to say that although a few adult female grizzly bears will be adversely affected by this forest plan, the forest plan as a whole is protective of grizzly bears and will not jeopardize their continued existence. That's the ultimate statutory conclusion that the Fish and Wildlife Service is required to make, and that's what they did in the forest plan – or in the biological opinion. I guess – I'm still wondering, if you have a lot of site-specific or short-term analyses, how would that account for long-term impact – sort of long-view impact? Because it sounded like what you said at the beginning was, well, we're going to have these periodic, you know, short-term – and it sounded tentative. It didn't sound like it's definitely going to be reviewed. But how would you not have this sort of incremental, small, short-term, that's not going to capture full long-term impact? I mean, I think, Your Honor, every time the Fish and Wildlife Service does this analysis for a short-term thing, they're still projecting long-term, and they're using the most up-to-date baseline based on current management and current status of the grizzly bears in the forest in making those determinations. So if the baseline changes, and then it turns out this new forest plan isn't having protective effects on grizzly bears, that's going to be Grizzly bears are doing really well in this forest. I think at 2 ER 140, that's clear. There's more than 1,000 on the forest. The populations are growing. They're expanding in geographical range. And the Fish and Wildlife Service recognizes that there are going to be some adverse effects that come from this forest plan. But that's primarily because the grizzly bears are doing so well in the forest. Their range is expanding. They're going to start running into humans a little bit more. So it's not – their continued existence is not being jeopardized by the forest plan, regardless of – I mean, plan is – argument, right, is they're doing so well because of the existing standards. Now you're taking them away, right? And that's going to give more license to essentially chip away at their habitat. And there's – I think what I struggle with is, why doesn't the future consultation process address that concern? And I think their argument is, well, when you do a project-specific analysis, essentially it opens the door to a sort of incremental degradation of the habitat. That's my best understanding of their argument. Do you have – you seem to be saying, well, you know, they will consider these things. Is it mandatory that they would consider, you know, and prevent incremental degradation? It's mandatory that, every time they consult, they determine whether or not the species will be in jeopardy after the action, which I think necessarily would take into account past incremental degradation. And the only other thing that I would point out is that the Fish and Wildlife Service is looking at this whole plan. This plan doesn't include these big game standards, but it's this suite of over 200 interacting components, different guidelines, and standards. And they're looking at the entire plan, and they're making the determination that this plan, as implemented, would not jeopardize grizzlies. So they're making the determination that's exactly the same determination that plaintiffs are asking them to make. This plan, without the big game standards, would it jeopardize grizzlies? I think plaintiffs are making a very formalist argument here as to the specific kind of content or the way the Fish and Wildlife Service has to describe the effects of various individual pieces of the prior plan and changes from the prior plan. But that's really not required under the ESA, the regulations, or the case law. And it wouldn't be practical either. These plans are made up of over 200 different interacting components. The Fish and Wildlife Service – or the Forest Service explains that to ER 179, these components are more than the sum of their parts. It's not that every individual standard has some sort of discernible, quantifiable impact on grizzlies. It's that this plan, when implemented as a whole over a long term, has some sort of effect on grizzlies. And that's the effect that the Fish and Wildlife Service looks at. If we had to reach harmless error, who has the burden? That's an issue that the parties seem to disagree on. Your Honor, I think the CBD v. Zinke case that we cite in our brief says that it's plaintiff's obligation to point to how any sort of error was harmless. And here, without pointing to – Was not harmless. Sorry? You said, was not harmless. Was – yes. Yes, was not harmless. Was harmful. Thank you, Your Honor. And here, without pointing to a more explicit discussion of how the big game – like, a more granular, specific discussion of how the big game standards could have affected the agency's analysis, plaintiffs haven't shown that any error in the agency's presentation was harmful. They make this assertion that the Fish and Wildlife Service didn't consider the big game standards when there's no evidence of that in the record. And then they don't explain how the analysis could be different or identify any category of – Isn't it generally the government's burden to show harmless error, especially where they've prevailed and you're seeking an affirmance? I – yeah. I'm not positive, Your Honor. I think the CBD case says that they have to show that the error was somehow harmful. But I think we have shown that the error would have been harmless here, regardless. Because there is no sort of example of a category of effects that was overlooked in the biological opinion. As I think you discussed with opposing counsel, the biological opinion discusses cover and vegetation at 2ER 124 to 128. It discusses roads and road density at 2ER 104 to 120. And those are big, lengthy sites because there's a lot of discussion of it in the biological opinion. So they don't identify any sort of category of effects or explain how the analysis could have been different were these big game standards to have been more granularly discussed. And I think as we've shown with the discussion of the roads, it's clear that the Fish and Wildlife Service knew what the plan was that it was analyzing. It knew that this plan did not include the 1986 big game standards because it was an entirely different plan. It was 200 different changes. It was updated after 35 years. So there was 35 years of outdated science in this 1986 plan, and it was after the forest had been administratively combined with the Lewis and Clark National Forest. So it was covering a vastly different area. This is a new plan the Fish and Wildlife Service looked at the entire thing when it made the determination that was required under the ESA. Would you need another big event like the combining of, you know, two separate forests to trigger the need for a revision of the forest plan in the future? Like, what would be the triggering event? I'm not sure the precise events that trigger a forest plan revision. I mean, I think they can be smaller things where the Forest Service is trying to take a different management or a priority or increased flexibility of management in some way, but... But those wouldn't be mandatory. Those sound discretionary. Is that right? Yes. I'm not sure what the mandatory forest plan revision triggers are. Unless the court has any further questions. Let me see if my colleagues have any more questions. No, thank you very much. Thank you, Your Honors. Your Honor, I just have a few points to make on rebuttal. One is, Your Honor, grizzly bears are doing well, and they are moving in different areas and covering – and having more parts of the helm. And I think that is, in large part, because of the robust standards they have. And the question is, what's going to happen now in the future? Nowhere in the biological opinion, when they talk about the effects of the action, do they talk about how this project – this new forest fund may have changed the baseline for bears. It's not mentioned at all. And that's what makes it different than the – you know, in the Western Watersheds case, it had to do with changes to grazing regulations. Or even in the Flathead Forest Plan revision case, which was very similar in terms of a challenge to a biological opinion, the court was looking at, how does this change the baseline? You're not just looking at the action itself in a vacuum or in isolation. You have to consider in broader context, what was there before and what changed? And here, we submit that the change was pretty significant for bears, potentially. Now, they're saying it was a harmless error if they didn't address it. It's going to have no bearing on the decision. But how can they really say that if they actually never did the analysis and never took that into account? And I think they do have the burden of showing that this clearly had no bearing. I don't think they can do that if they overlooked a significant portion or significant issue in this case. So I guess the takeaway for us is, yes, they looked at the baseline. Yes, they looked at the action. But they never looked at how the action affected the baseline. And that's critical. Like, in the National Wildlife Federation case, this court explained that you have to understand – you have to add the action to the baseline. If the baseline is already bad or degraded, you really have to fully understand if you're going to be making it worse or better. In this case, grizzly bears lost a fairly significant standard of protections in the Helena's Forest Plan. We believe that should have been what was never accounted for in the action. And it's very different if you're talking about something that was part of an old biological opinion on the Helena that benefited bears. What significant protections did the bears lose? Well, I think, Your Honor, the number-one threat to bears is human intrusion on roads and motorized access. And to have Standard 4a as one of the big-game standards, which limited road densities across the forest with no exceptions for private roads, for temperate – to have that removed from the forest plan could potentially have significant ramifications for grizzly bears and their ability to move. And that was never accounted for in the biological opinion. What consideration was given to road? They talked about, in general, motorized access and road densities. But I think a good example of what was missing, of why it matters, Your Honor, like what is the discussion on 2ER114, where they're saying, hey, over the last eight years, this is how many roads we had on the forest. That's going to be the same going forward for logging projects. And that's just not true, Your Honor, because it was only that way in the past because of the standards. The standards are gone. So, as Judge Sung mentioned earlier, we don't know exactly how many roads are going to be built on the forest in the future with future projects. But what we do know is those sideboards – those guardrails – are gone. And so that's something that I think the Fish and Wildlife Service should have addressed in the biological opinion and failed to do so. Do my colleagues have any further questions? No. No, thank you. Judge Sung, do you have any further questions? No? All right. Thank you very much.  Okay. Thank you to both counsel for your very helpful arguments. This case is now submitted.
judges: BEA, KOH, SUNG